GORDON ROLAND MORRIS V. STATE

No. 27,025. June 23, 1954
Rehearing Denied November 3, 1954

*Joe Harris, John Benn,* Houston, and *Sid White,* Oklahoma City, Okla., for appellant.

*Ewing Werlein,* District Attorney, *King C. Haynie,* Assistant District Attorney, Houston, and *Wesley Dice,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

Appellant was convicted for the murder of Ruby Lee Nietman by striking her with his hands or fists or by kicking or stamping her with his feet, or by one or all of said means, and his punishment was assessed at death.

The sufficiency of the evidence is the sole question presented, it being contended that the evidence does not show an intent to kill on the part of appellant and also that there was no legal and competent evidence establishing the fact that the deceased came to her death at his hands.

On the morning of July 12, 1953, officers, responding to a call, found the dead body of Ruby Lee Nietman in the room of Doyle Johnston. No one was present when the officers arrived but while they were there appellant walked up and said he was the man they were looking for, that he "had stamped Ruby."

Doyle Johnston, a cripple, owned the two-story apartment house. Appellant and the deceased had, some three or four days previously, rented an upstairs apartment from him.

It seems that the deceased and Earl Tillman, who also had recently become a roomer in the Doyle Johnston house, left together about 11 A.M. and returned about 5 P.M., during which time they were drinking. Tillman let her out at the house and

himself entered some thirty minutes later and wento to his room, which adjoined that occupied by Doyle Johnston.

About 10 P.M. Tillman heard someone talking in Doyle Johnston's room and went in. Appellant, Cecil Bedgood, Doyle Johnston and the deceased were there, the deceased Ruby Lee was lying on a couch, and appellant, after remarking to Tillman "You make me feel about that high," kicked the deceased several times in the head.

Cecil Bedgood also testified that appellant kicked deceased in the face four or five times as she lay on the couch, and quoted him as saying that he had nothing against Tillman, saying to the deceased: "I am going to kick your God damn head in."

There appears to have been considerable drinking of whisky, the deceased having participated even after the above kicking had occurred. A urine test, after her death, showed that she was intoxicated.

Doyle Johnston testified that he was present with appellant when the deceased came home; that appellant and the deceased started fussing in his room and appellant "slapped her down and stamped her a few times," after which he (Johnston) went to the kitchen and then into Tillman's room; that Tillman and Bedgood left and thereafter he heard appellant and the deceased arguing and fussing in his bedroom, and heard "blundering" - - - "bump, bump, bump - - - like the stamping had started up again."

This continued for four or five minutes, according to Johnston, during which time the deceased screamed out "Oh, Gordon, please don't do that." After this everything got quiet.

Johnston then walked to the door and into the room and saw the deceased lying on her back on the floor. Appellant was standing over her with his right foot raised over her head and neck. Appellant, seeing Johnston, lowered his foot to the floor, walked over to the crippled Johnston and said "Do you want some of it?" Then remarked "She wont be so popular now. The boys wont want to have anything to do with her. I really cut her a God damn big opening."

At this time the deceased was unconscious and was lying on the floor with her dress above her knees and Johnston observed that there was "blood all over the front of it" and there was blood on her face.

The deceased appeared to be struggling for breath and Johnston told appellant that he should do something for her, to which appellant replied: "Let the God damn bitch die. That's what she needs anyway."

Appellant then picked up the deceased and placed her on Johnston's bed where she lay for some ten minutes without moving or saying a word. Johnston asked appellant to get her some water; to "do something or another for her; put her in another bed; get her out of my bed."

Appellant then "went around and got her by the heels and drug her off my bed - - - she first hit the floor, the back of her head - - - ." He then picked her up from the floor and placed her on the studio couch where her body was found the next morning.

According to Johnston this occurred about 11 P.M. and during the remainder of the night she was struggling for breath and nothing was done for her, though Johnston and appellant remained in the room. Johnston slept in his bed and appellant on a pallet beside it. Johnston explained that he was in fear of appellant.

A little after daylight appellant left the house. Johnston noticed that she had ceased struggling for breath and went to her, then "rolled back from my bed in the wheel chair and put my false leg on as quick as I could and I grabbed my crutch and went to call for help."

Justice of the Peace R. R. Zierlein viewed the body and ordered an inquest. He described the injuries on the body as including a bruised and swollen face; bleeding from the mouth; swollen bruised and bloody sexual parts; bruises on left side of the face, jaw and neck, and the lip and lower part of the chin and face.

Dr. Harold Wood, Associate County Physician for Harris County, who participated in performing the autopsy, testified in part as follows:

"Q. As a result of your examination, and the autopsy you performed, will you tell us the nature of the injuries, if any, that she had? A. On the body of Ruby Lee Nietman there were many bruises and abrasions of the skin. There was a bruise over the left eyebrow. There were bruises along the side of the neck. There were bruises over the chin. There were bruises of

the right shoulder. There were bruises below the left collar bone and there were bruises of both arms and both legs, and there were bruises and abrasions of the surface of the private organs of both the entrance to the vagina and the entrance to the rectum, and the hair around the private organs and around that general region were bloodstained. That consisted of the external examination of the body."

Dr. Wood further testified that bruises of the nature found were the result of severe violence; that he determined from the autopsy that the immediate cause of death was a large subdural hemorrhage, a hemorrhage beneath the covering of the brain on the left side, and that it "was such a hemorrhage as could be caused by a person stamping violently with a foot and with a shoe on the foot against the head and face of that individual."

We are not impressed with the suggestion that appellant, because of his intoxicated condition, could not form an intent to kill or act with malice. Intoxication, though resulting in temporary insanity, is not available as a defense to crime.

We find the evidence sufficient to support the jury's finding that appellant inflicted the injuries upon the deceased with malice and with intent to murder, and that the injuries so inflicted caused the death of the deceased.

The judgment is affirmed.

### ON MOTION FOR REHEARING

MORRISON, Judge.

It is earnestly urged that the evidence is insufficient to support the count in the indictment under which this case was submitted to the jury. Count one charged that the accused caused the death of the deceased by striking her with his hands and fists and by kicking and stamping her with his feet. Count two contained the same allegation and the following additional charge: "and in some way or manner or by some means, instruments and weapons to the grand jury unknown." The case was submitted to the jury under count one.

Appellant's position seems to be predicated upon the contention that the subdural hemorrhage on the left side of the brain which brought about the death of the deceased could have been caused by the appellant when he drug the deceased off the bed

by her heels causing her head to hit the floor, as well as by kicking her with his feet.

Dr. Wood, who performed the autopsy, testified that the fatal injury was one that could be caused by stamping with a foot.

Under this evidence we think the jury was warranted in finding the appellant guilty under count one of the indictment.

Appellant's motion for rehearing is overruled.